UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CARMEN BELEM PIMENTEL ALCOCER, an individual, on behalf of herself and all others similarly situated, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:25-CV-1760-SEG |
| CREDIT UNION OF GEORGIA, | |
| Defendant. | |

## O R D E R

This matter is before the Court on Defendant's motion to compel arbitration. (Doc. 12.) After careful consideration, the Court enters the following order.

## I.     Background

Plaintiff Carmen Belem Pimentel Alcocer brings this suit against Defendant Credit Union of Georgia ("CUGA"), alleging that CUGA denied her and similarly situated immigrants full and equal consideration for loans based on their alienage in violation of 42 U.S.C. § 1981. (First Am. Compl., Doc. 10.) Plaintiff's amended complaint asserts a single claim of alienage discrimination under Section 1981. (*Id.* ¶¶ 44-53.) Defendant moves to compel arbitration on Plaintiff's Section 1981 claim and stay the case. (Doc. 12.) Defendant contends

that Plaintiff entered into a Membership and Account Agreement with Defendant, which included a mutual agreement to arbitrate claims arising from the parties' relationship. (Doc. 12-4 at 8-10.) Plaintiff opposes the motion to compel arbitration on several grounds, including that no contract was formed between the parties, that the arbitration agreement is unconscionable, and that Plaintiff's claim does not fall within the arbitration agreement. (Doc. 14.)

## II.  Legal Standard

The validity of arbitration agreements is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, which was enacted "to overcome judicial resistance to arbitration" and "declare a national policy favoring arbitration of claims that parties contract to settle in that manner." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1345 (11th Cir. 2017) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)) (cleaned up). Section 2 of the FAA provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . , or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2. The U.S. Supreme Court has interpreted Section 2 of the FAA as "reflecting both a liberal federal policy favoring arbitration . . . and the

fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotations omitted). As such, "courts must place arbitration agreements on an equal footing with other contracts, . . . and enforce them according to their terms[.]" *Id.* (citations omitted).

The FAA also "establishes procedures by which federal courts implement [Section] 2's substantive rule." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010). Pursuant to Section 3, "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Id.* (quoting 9 U.S.C. § 3). Further, under Section 4, "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such [an] agreement.'" *Id.* (quoting 9 U.S.C. § 4). Thereafter, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue[,]" the court *shall* order arbitration. *Id.* (quoting 9 U.S.C. § 4).

On a motion to compel arbitration, courts generally evaluate whether "(a) the [parties] entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims

before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). If an arbitration agreement satisfies both of these gateway requirements, a court must either stay or dismiss the lawsuit and compel arbitration. *Id.* In short, "where the parties have agreed to arbitrate their dispute, the job of the courts—indeed, the obligation—is to enforce that agreement." *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018).

To determine whether the parties reached an agreement to arbitrate, district courts employ a "summary judgment-like standard" and "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "An issue is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). Further, "conclusory allegations without specific supporting facts have no probative value for a party resisting summary judgment." *Bazemore*, 827 F.3d at 1333 (cleaned up).

### III.    Discussion

As a threshold matter, Plaintiff does not appear to dispute that the Membership and Account Agreement is a contract "evidencing a transaction involving commerce" and is therefore governed by the FAA.  *See* 9 U.S.C. § 2. The Court thus begins by analyzing whether the parties formed a valid agreement to arbitrate and then addresses several other issues raised by the parties.

### A. Formation of Arbitration Agreement

Although the FAA applies to this case, to determine whether the parties formed an agreement to arbitrate, courts apply state contract law.  *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367-68 (11th Cir. 2005).  The parties appear to agree that Georgia law governs in this matter.  (*See* Doc. 12 at 8 (arguing that Georgia law applies); Doc. 14 at 7 (citing Georgia law on contract formation).)  In Georgia, a contract is enforceable if "there is (a) a definite offer and (b) complete acceptance (c) for consideration."  *Lambert*, 544 F.3d at 1195; *see also* O.C.G.A. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.").  The party seeking to compel arbitration has the burden to demonstrate that a valid agreement to arbitrate exists and must

do so by a preponderance of the evidence.  *Bazemore*, 827 F.3d at 1330 (citing *Wallace v. Triad Systems Financial Corp.*, 442 S.E.2d 476, 478 (Ga. Ct. App. 1994)).

Defendant CUGA contends that all the elements of contract formation are present.  Specifically, CUGA argues that it "presented Plaintiff with an offer to apply for membership pursuant to the terms of the Membership and Account Agreement, which included the Arbitration Agreement, and Plaintiff accepted the offer[.]"  (Doc. 12-4 at 9.)  The primary evidence that Defendant relies upon to demonstrate the formation of a valid contract is an online membership application (the "Application") that includes an electronic signature from Plaintiff.  (Doc. 12-2.)  In relevant part, the signature section of the Application (the "Signature Card") provides that "[b]y signing below, I/we agree to the terms and conditions of the Membership and Account Agreement[.]"  (*Id.* at 3.)  In addition, the Signature Card includes the following acknowledgment: "I/We acknowledge receipt of a copy of the agreements and disclosures applicable to the accounts and services requested herein."  (*Id.*)  The Signature Card reflects that Plaintiff electronically signed the document on May 14, 2021, via a platform called "DocuSign."  (*Id.*)  Further, CUGA's President and CEO, Brian Albrecht, avers that "[t]he Membership and Account Agreement, which included CUGA's mutual Arbitration Agreement is sent to

all applicants by electronic mail." (Albrecht Decl.; Doc. 12-3 ¶ 7.)  Defendant
has also attached a copy of the Membership and Account Agreement that
Plaintiff purportedly received by email.  (*Id.* ¶ 8; Membership and Account
Agreement, Doc. 12-1.)

Plaintiff does not dispute that she signed the Signature Card included in
CUGA's Application, which referred to the Membership and Account
Agreement.  Instead, Plaintiff denies entering an agreement to arbitrate on
the ground that "Defendant has not produced evidence that it specifically sent
Plaintiff an email with its Membership Agreement attached or [showing] what
the presentation of the Membership Agreement looked like for Plaintiff at the
time she signed the signature card." (Doc. 14 at 8.)  In other words, Plaintiff
contends that "[t]he fact that Plaintiff signed the signature card—which makes
no reference to the Arbitration Agreement—is not dispositive evidence that
Plaintiff saw or received the Arbitration Agreement before she signed, or that
she received the agreement after signing." (*Id.* at 9.)

Plaintiff Alcocer avers that she does not "recall viewing a copy of the
Membership and Account Agreement ('Membership Agreement') or a copy of
the Binding Arbitration and Class Action Waiver ('Arbitration Agreement')" at
the time she completed the Application.  (Alcocer Decl., Doc. 14-2 ¶ 8.)  In
addition, she affirms that "[n]one of Defendant's representatives told [her],

either before or after [she] signed the signature card, that the Membership Agreement, which contained the Arbitration Agreement, would be sent via separate email." (*Id.* ¶ 9.) Ms. Alcocer also states that she has searched her email account, including its deleted emails folder, for all emails Defendant sent on or around May 14, 2021, and has not located an email including the Membership and Account Agreement. (*Id.* ¶ 11.) Based on these representations, Ms. Alcocer concludes that she has "no record" of "and do[es] not recall ever being given a copy of the Membership Agreement or the Arbitration Agreement in effect at the time I signed the signature card [or] after I become a CUGA member." (*Id.* ¶ 12.)

Despite Plaintiff's affirmation that she has "no record" of and "does not recall" receiving the Membership and Account Agreement, the Court finds that Plaintiff's execution of the Signature Card is sufficient to demonstrate that the parties entered into a mutual agreement to arbitrate. This case presents a set of facts that bears a striking resemblance to that analyzed by the Eleventh Circuit in *Larsen v. Citibank FSB*, 871 F.3d 1295, 1304 (11th Cir. 2017). There, as here, the plaintiff signed a signature card attesting that he understood that his accounts were subject to a particular account agreement. *Id.* at 1305. The signature card also required the plaintiff, David Johnson, to acknowledge receiving a copy of the account agreement. *Id.* There was no dispute that Mr.

Johnson executed the signature card; instead he argued—as Ms. Alcocer does here—that "he did not assent to [the account agreement] because he did not receive a copy of it when he signed the . . . Signature Card." *Id.* at 1307. The Eleventh Circuit noted that the argument "lean[ed] on a very thin reed" because "Johnson testified only to the absence of any memory, one way or another, whether he received a copy of the agreement[.]" *Id.*

Applying Ohio contract law, the *Larsen* Court first determined that Mr. Johnson's "failure to remember any details of the . . . transaction is obviously not sufficient to rebut the inference we draw from his written, contemporaneous acknowledgement of receipt." *Id.* Most damaging to Plaintiff's argument here, however, the Eleventh Circuit reasoned that "whether Johnson was handed a copy of the deposit account agreement that would govern the Joint Account and that was incorporated by reference into the 2001 Signature Card [was], ultimately, irrelevant[.]" *Id.* Instead, because "[a] consumer of 'ordinary mind' has an obligation to 'read what [he] signs[,]'" the Eleventh Circuit held that Mr. Johnson could not "evade the commitment to arbitrate by claiming he did not investigate the terms to which his new account was subject before signing the 2001 Signature Card[.]" *Id.* (quoting *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 579 (Ohio 1998)).

Although *Larsen* applied Ohio contract law, analogous principles of Georgia law require the same result in this case.  Under Georgia contract law, "incorporation by reference is generally effective to accomplish its intended purpose where the provision to which reference is made has a reasonably clear and ascertainable meaning."  *Wilson v. Clark Atlanta Univ., Inc.*, 794 S.E.2d 422, 432 (Ga. Ct. App. 2016); *Town Ctr. Assocs. v. Workman*, 487 S.E.2d 624, 625 (Ga. Ct. App. 1997) (same); *Binswanger Glass Co. v. Beers Const. Co.*, 234 S.E.2d 363, 365 (Ga. Ct. App. 1977) (same).  Put another way, "two or more documents can together create a single contract if one of them is referenced by or incorporated into the other."  *Harris v. Baker*, 652 S.E.2d 867, 869 (Ga. Ct. App. 2007); *see Bowman v. Walnut Mountain Prop. Owners Ass'n, Inc.*, 553 S.E.2d 389, 393 (Ga. Ct. App. 2001) ("A written and filed agreement may also incorporate by reference, as was done here, other documents by specific reference and identification so that such documents are treated as if a part of the document making the reference."); *Consol. Freightways Corp. of Delaware v. Synchroflo*, 294 S.E.2d 643, 645 (Ga. Ct. App. 1982) ("Where a writing refers to another document, that other document, or as much of it as is referred to, is to be interpreted as part of the writing.").  "As long as a contract makes clear reference to the document to be incorporated and describes it in such terms that its identity can be ascertained beyond doubt, parties to a contract may

incorporate contractual terms by reference to a separate, noncontemporaneous document . . . including a separate document which is unsigned." *Henkel Corp. v. Leggett & Platt, Inc.*, No. CIV.A.1:09CV0463RLV, 2009 WL 2230813, at *2 (N.D. Ga. July 24, 2009) (cleaned up); *see* 11 Williston on Contracts § 30:25 (4th ed.) ("As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, . . . including a separate document which is unsigned.").

The Signature Card that Plaintiff executed in this case required the signer to "agree to the terms and conditions of the Membership and Account Agreement[.]" (Doc. 12-2.)  In so doing, the Signature Card clearly identified the Membership and Account Agreement and incorporated its provisions by reference.  Thus, when Plaintiff signed the Signature Card, the terms of the Membership and Account Agreement became effective with respect to her account.[1]

---

[1] In her response brief, Plaintiff does not dispute that the Membership and Account Agreement that Defendant has submitted, (Doc. 12-1), is the version of the agreement that was in effect on May 14, 2021, when Plaintiff executed the Signature Card.  Although the first page of the Membership and Account Agreement does not provide an effective date for the agreement, the Truth-in-Savings Disclosure portion of the agreement reflects an effective date of March 26, 2021, which is consistent with the date on which Plaintiff signed the

Furthermore, in Georgia, "[a] person who signs a contract is imputed with knowledge of the contents of that contract. Specifically, everyone is charged with the responsibility of reading and knowing the contents of a contract which he signs." *D.L. Lee & Sons, Inc. v. ADT Sec. Sys., Mid-S., Inc.*, 916 F. Supp. 1571, 1578 (S.D. Ga. 1995), *aff'd*, 77 F.3d 498 (11th Cir. 1996); *see Hembree v. Johnson*, 482 S.E.2d 407, 408 (Ga. Ct. App. 1997) ("It was incumbent upon Hembree to read the contract and apprise himself of the terms to which he assented."). That is,

> [w]here one who can read signs a contract without apprising himself of its contents, otherwise than by accepting representations made by the opposite party, with whom there exists no fiduciary or confidential relation, he can not defeat an action based on it, or have it canceled or reformed, on the ground that it does not contain the contract actually made, unless it should appear that at the time he signed it some such emergency existed as would excuse his failure to read it, or that his failure to read it was brought about by some misleading artifice or device perpetrated by the opposite party, amounting to actual fraud such as would reasonably prevent him from reading it.

*Thornton v. Uber Techs., Inc.*, 858 S.E.2d 255, 258 (Ga. Ct. App. 2021) (quoting *Lovelace v. Figure Salon*, 345 S.E.2d 139 (Ga. Ct. App. 1986)).

---

Signature Card. (*Id.* at 23.) Based on the date listed on this portion of the agreement, along with Mr. Albrecht's affirmation that the document is a copy of the agreement that Plaintiff acknowledged receiving, (Doc. 12-3 ¶ 8), the Court finds that Defendant has shown by a preponderance of the evidence that the Membership and Account Agreement attached to its motion was in effect at the time Plaintiff signed the Signature Card.

Accordingly, under Georgia law, Plaintiff had an affirmative responsibility to investigate the terms that she was agreeing to when she signed the Signature Card. The Signature Card unambiguously alerted her to the fact that she was bound by the terms and conditions set forth in the Membership and Account Agreement. That Plaintiff now avers that she may not have actually received a copy of the Membership and Account Agreement will not permit her to evade its terms, which were incorporated into the Signature Card. *See Larsen*, 871 F.3d at 1307 ("If we permitted Johnson to evade the commitment to arbitrate by claiming he did not investigate the terms to which his new account was subject before signing the 2001 Signature Card, few deposit agreements would ever be enforceable."); *Dan J. Sheehan Co. v. Ceramic Technics, Ltd.*, 605 S.E.2d 375, 379 (Ga. Ct. App. 2004) (finding that a plaintiff's "lack of recollection of the receipt of the second page does not create a material question of fact in light of the incorporation by reference" of the second page by the first page of the application); *Lawson v. ADT Sec. Servs., Inc.*, 899 F. Supp. 2d 1335, 1339 (M.D. Ga. 2012) (determining, under Georgia law, that a plaintiff was bound by an allegedly "missing" page of a contract, because "parties have the responsibility to seek explanation when they are put on notice of absent content" and "[n]egligent ignorance of terms will not bar incorporation"). The Court therefore finds that by signing the Signature Card,

Plaintiff agreed to the terms set forth in the Membership and Account Agreement.

With the question of Plaintiff's assent to the Membership and Account Agreement now resolved, the Court readily determines that the parties entered into a mutual agreement to arbitrate. The Membership and Account Agreement contains a set of arbitration provisions under the heading "BINDING ARBITRATION AND CLASS ACTION WAIVER" (the "Arbitration Agreement"). (Doc. 12-1 at 11.) The second provision, titled "Agreement to Arbitrate Disputes[,]" provides that "[e]ither you or we may elect, without the other's consent, to require that any dispute between us concerning your Accounts and the services related to your accounts be resolved by binding arbitration, except for those disputes specifically excluded below." (*Id.*) Under the heading "Disputes Covered by Arbitration[,]" the Arbitration Agreement further states:

> You acknowledge that in arbitration there will be no right to a jury trial. Any claim or dispute relating to or arising out of your accounts or our relationship will be subject to arbitration, regardless of whether that dispute arose before or after your receipt of this notice. Disputes include claims made as part of a class action, private attorney general or other representative action, it being expressly understood and agreed to that the arbitration of such claims must proceed on an individual (non-class, non-representative) basis and the arbitrator may award relief only on an individual (non-class, non-representative) basis. Disputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions. Any questions about whether disputes are subject

to arbitration shall be resolved by interpreting this arbitration provision
in the broadest way the law will allow it to be enforced.

All disputes are subject to arbitration, no matter what legal theory they
are based on, or what remedy (damages, or injunctive or declaratory
relief) they seek. . . . .

(*Id.*)  The Arbitration Agreement also afforded Plaintiff the opportunity to opt-

out of its arbitration provisions by sending written notice to CUGA within 30

days of account opening or receiving the notice.  (*Id.* at 12.)  Mr. Albrecht avers

that CUGA has not received any notice from Ms. Alcocer opting out of the

arbitration agreement.  (Doc. 12-3 ¶ 10.)  Nor does Ms. Alcocer suggest the she

sent such a notice to CUGA.

Aside from the challenge to her assent to the Arbitration Agreement,

Plaintiff does not appear to dispute any other element of contract formation.

In any event, Defendant has satisfied its burden to demonstrate the formation

of a valid agreement to arbitrate.  Defendant made an offer to Plaintiff to

arbitrate all disputes between them by presenting her with the Signature

Card, which incorporated by reference the Membership and Account

Agreement.  Plaintiff then accepted the offer by signing the Signature Card

and by failing to send an opt-out notice.  *See Larsen*, 871 F.3d at 1307 ("By

providing uncontroverted evidence of Johnson's execution of the 2001

Signature Card, KeyBank has met its burden of establishing that Johnson

consented to the arbitration provision incorporated by reference therein.").

Further, "the mutual promises and obligations of the parties" contained in the Agreement—including the mutual promise to arbitrate any disputes— "constituted sufficient consideration for the contract." *Atlanta Six Flags P'ship v. Hughes*, 381 S.E.2d 605, 607 (Ga. Ct. App. 1989); *see Lambert*, 544 F.3d at 1195. As such, the Court finds by a preponderance of the evidence that the parties assented to a valid arbitration agreement that was supported by adequate consideration.

## B. Arbitrability of Plaintiff's Claim

Plaintiff contends that even if the parties entered an agreement to arbitrate, her Section 1981 claim concerning the denial of her loan application falls outside the scope of the Arbitration Agreement. (Doc. 14 at 17-23.) The Court respectfully disagrees. The Arbitration Agreement provides that "[a]ny claim or dispute *relating to or arising out of your accounts or our relationship* will be subject to arbitration, regardless of whether that dispute arose before or after your receipt of this notice." (Doc. 12-1 at 11 (emphasis added).) Further, the Arbitration Agreement provides that "[a]ny questions about whether disputes are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced." (*Id.*)

The U.S. Supreme Court has instructed that courts should construe "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Plaintiff's claim, which is based on the denial of a loan application, relates to her banking "relationship" with CUGA. While Plaintiff suggests that "the Eleventh Circuit has yet to opine on whether such a broad clause is enforceable according to its literal terms[,]" the Court is unpersuaded. (Doc. 14 at 22.) To the contrary, the Eleventh Circuit has recognized that there "is nothing unusual about an arbitration clause, especially in an account agreement, that requires arbitration of *all disputes between the parties to the agreement*" including "more than just those matters set forth in the contract." *Bd. of Trs. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Markets, Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (emphasis added).

In any event, the Court considers the provision of loan services to be sufficiently related to Plaintiff's CUGA "account," such that it "relat[es] to or aris[es] out of [her] accounts" within the context of the Membership and Account Agreement. (Doc. 12-1 at 11.) As an initial matter, banks routinely offer loans to their account holders. This is the bread and butter of how banks make money. *See, e.g., Calderon Serra v. Banco Santander Puerto Rico*, 747 F.3d 1, 3 (1st Cir. 2014) ("The Bank makes money, in part, by making loans to

its customers."). Not only is language regarding the scope of arbitrability to be interpreted broadly, but in this case, Plaintiff was required to become a CUGA member to access its financial services. 12 U.S.C. § 1757 (providing federal credit unions with the power "to make loans . . . *to its members*" (emphasis added)). Indeed, Plaintiff herself avers that she "chose to open a CUGA account *in order to* ultimately secure an auto loan after moving to Georgia." (Doc. 14-2 ¶ 16 (emphasis added).) Because Plaintiff could not apply for a loan without opening an account at CUGA, her claim—based on the denial of her application for a loan—relates to her account. *See, e.g., Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215-16 (11th Cir. 2021) (finding that the plaintiff's claim related to a subscriber agreement based, in part, on "the fact that Comcast would not have access to [plaintiff's] personal information— and therefore could not have engaged in the allegedly tortious conduct—but for the pre-existing Agreement").

The Court therefore finds that Plaintiff's Section 1981 claim, which is based on the denial of her loan application, relates to both her CUGA account and her relationship with CUGA. As such, Plaintiff's claim squarely falls within the scope of the parties' Arbitration Agreement.

## C. Unconscionability of Arbitration Agreement

Plaintiff also argues that the Arbitration Agreement is unenforceable due to unconscionability.  (Doc. 14 at 14-17.)  The Arbitration Agreement, however, delegates disputes "relating to the enforceability or interpretation of any of these arbitration provisions" to an arbitrator.[2]  (Doc. 12-1 at 11.)  The Supreme Court has "recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability'" including enforceability, *Jackson*, 561 U.S. at 68-69, so long as that delegation is clear and unmistakable, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (explaining that a question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise" (cleaned up)).

The doctrine of unconscionability is a defense to the *enforceability* of a contract.  *See Caley*, 428 F.3d at 1377 (recognizing unconscionability as a challenge to enforceability of a contract); O.C.G.A. § 11-2-302(1) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse *to enforce* the contract[.]"  (emphasis added)).    Here, the parties have clearly and

---

[2] Specifically, the Arbitration Agreement provides that "[a]ny claim or dispute relating to or arising out of your accounts or our relationship will be subject to arbitration[.]"  (Doc. 12-1 at 11.)  It then states, in the same paragraph, that such "[d]isputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions."  (*Id.*)

unmistakably delegated questions of enforceability to an arbitrator. As such, issues regarding the enforceability of the Arbitration Agreement—including any dispute over the purported unconscionability of its provisions—should be resolved by an arbitrator in the first instance. *See Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1303 (11th Cir. 2022) ("A delegation agreement commits questions of arbitrability to an arbitrator's review, including questions about the validity or enforceability of the parties' primary arbitration agreement."); *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017) ("We have found the requisite intent when the delegation provision at issue committed to arbitration 'any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement[.]'" (internal quotation omitted).); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015) ("[W]here an arbitration agreement contains a delegation provision—committing to the arbitrator the threshold determination of whether the agreement to arbitrate is enforceable—the courts only retain jurisdiction to review a challenge to that specific provision.").[3]

---

[3] Plaintiff's response brief does not include any argument specifically challenging the validity or enforceability of the agreement to delegate issues of enforceability. *See Attix*, 35 F.4th at 1295 ("[I]t is up to the parties to specifically challenge the delegation agreement's validity or enforceability.").

In short, the Court finds that (1) the parties entered into a mutual agreement to arbitrate, (2) Plaintiff's Section 1981 claim falls within the scope of the parties' Arbitration Agreement, and (3) any questions regarding the enforceability of the Arbitration Agreement—including Plaintiff's contention that the agreement is unconscionable—should be resolved by an arbitrator in the first instance. Plaintiff therefore must arbitrate her claim.

### D. Stay of Proceedings

Defendant has requested that the Court stay this matter pending adjudication of any arbitration proceeding. (Doc. 12.) Where, as here, the claims brought by a party are subject to arbitration and a party requests a stay, Section 3 of the FAA requires that the Court compel arbitration and stay proceedings pending arbitration. 9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration."). Accordingly, the Court will compel arbitration of Plaintiff's claim and stay this case pending arbitration.

### E. Defendant's Request for Attorney's Fees and Costs Under O.C.G.A § 13-6-11

Defendant requests attorney's fees and costs associated with bringing this motion pursuant to O.C.G.A § 13-6-11.  (Doc. 12-4 at 12-13.)  O.C.G.A. 13-6-11 provides that

> [t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

Plaintiff correctly notes that except where a defendant brings counterclaims, "[a]s a general rule, only a plaintiff is authorized to recover attorney fees under OCGA § 13-6-11." *Vickery Falls, LLC v. ASIH, LLC*, 841 S.E.2d 25, 28 (Ga. Ct. App. 2020), *overruled in part by SRM Grp., Inc. v. Travelers Prop. Cas. Co. of Am.*, 841 S.E.2d 729 (Ga. 2020); (*see* Doc. 14 at 23-24.).  Further, Defendant does not cite any Georgia court decision that awards attorney's fees and costs under O.C.G.A § 13-6-11 to a defendant on a motion to compel.

Even if the Court could award attorney's fees and costs for a defendant's motion to compel, it would not do so here.  Upon review of the parties' submissions, the Court does not find any bad faith warranting a fee award pursuant to O.C.G.A. § 13-6-11.  *See Jones v. Sentry Select Insurance Company*, No. 1:20-CV-3781-MHC, 2021 WL 9771803, at *6 (N.D. Ga. Dec. 29, 2021) ("Bad faith requires . . . a dishonest purpose or some moral obliquity and

implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will."). Moreover, a litigant "cannot claim stubborn litigiousness when 'a bona fide controversy exists between the parties.'" *Cornelius v. Home Comings Fin. Network, Inc.*, 293 F. App'x 723, 728 (11th Cir. 2008) (quoting *Marshall v. King & Morgenstern*, 613 S.E.2d 7, 13 (Ga. Ct. App. 2005)). Plaintiff's arguments regarding whether she assented to the terms of Membership and Account Agreement, whether her Section 1981 claim falls the scope of the parties' Arbitration Agreement, and whether the Arbitration Agreement was unconscionable raised sufficiently close questions of law to render this case a "bona fide controversy." Defendant's request for attorney's fees and costs under O.C.G.A § 13-6-11 is denied.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion to compel arbitration (Doc. 12) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted except with respect to Defendant's request for attorney's fees and costs under O.C.G.A § 13-6-11, which is denied.  It is **ORDERED** that:

1. Plaintiff and Defendant shall proceed with arbitration in accordance with the Arbitration Agreement contained in the Membership and Account Agreement;

2. Plaintiff is **DIRECTED** to initiate arbitration within 90 days of the entry of this order.  **Plaintiff is advised that failure to initiate arbitration within 90 days may result in dismissal of this action.**

3. This case is **STAYED** during the pendency of arbitration;

4. Plaintiff and Defendant are **DIRECTED** to submit status reports to the Court every 120 days;

5. Plaintiff and Defendant are **DIRECTED** to notify the Court within 30 days of the completion of arbitration;

6. This case is **ADMINISTRATIVELY CLOSED** during the period of the stay.

**SO ORDERED**, this 6th day of February, 2026.

SARAH E. GERAGHTY
United States District Judge